[Cite as *Third Fed. S. & L. Assn. of Cleveland v. Formanik*, 2016-Ohio-7478.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 103649

---

# THIRD FEDERAL SAVINGS & LOAN ASSOCIATION OF CLEVELAND

PLAINTIFF-COUNTERCLAIM
DEFENDANT/APPELLEE

vs.

# RONALD S. FORMANIK, ET AL.

DEFENDANTS-COUNTERCLAIM
PLAINTIFFS/APPELLANTS

---

### JUDGMENT:
AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-10-738704

**BEFORE:** E.A. Gallagher, P.J., Stewart, J. and Laster Mays, J.

**RELEASED AND JOURNALIZED:** October 27, 2016

**ATTORNEY FOR APPELLANTS**

Kathleen Amerkhanian
Kryszak & Associates Co., L.P.A.
5330 Meadow Lane Court, Suite A
Sheffield Village, Ohio 44035


**ATTORNEYS FOR APPELLEE**

Jessica M. Wilson
Dean K. Hegyes
Reimer, Arnovitz, Chernek & Jeffrey Co., L.P.A.
P.O. Box 3969
30455 Solon Road
Solon, Ohio 44139

EILEEN A. GALLAGHER, P.J.:

**{¶1}** Defendants-counterclaim plaintiffs/appellants, Ronald Formanik ("Formanik") and Vicki Formanik (collectively, the "Formaniks"), appeal the trial court's judgment in favor of plaintiff-counterclaim defendant/appellee Third Federal Savings & Loan Association of Cleveland ("Third Federal") on the Formaniks' claims for breach of implied contract, breach of the covenant of good faith and fair dealing, a violation of R.C. 1345.031(B)(12) and "wrongful foreclosure" arising out of Third Federal's filing of a foreclosure action following Formanik's alleged default on a bridge loan he had obtained from Third Federal. The Formaniks argue that the trial court erred in finding that Third Federal did not breach the terms of the bridge loan and that the parties' course of performance did not give rise to an implied contract that extended the maturity date of the bridge loan. The Formaniks further argue that the trial court erred in finding that Third Federal did not act in bad faith in refusing to accept interest-only payments after the loan was allegedly in default and refusing to remove negative information from Formanik's credit report regarding the loan. Finally, the Formaniks contend that the trial court erred in concluding that Third Federal had not engaged in unlawful "mortgage flipping" and that their claim for "wrongful attempted foreclosure" is not cognizable under Ohio law.

**{¶2}** For the reasons that follow, we affirm the trial court's judgment.

**Factual and Procedural Background**

**{¶3}** In August 2007, Formanik obtained a bridge loan from Third Federal, executing a note payable to Third Federal for the principal amount of $113,000. The

purpose of the bridge loan was to provide funds for the Formaniks' down payment on a new home in North Royalton and was secured by a mortgage on the Formaniks' then-residence in Middleburg Heights.[1]  Under the terms of the note, the principal balance and accrued interest were due on the maturity date, September 1, 2008, with interest accruing on the outstanding principal balance at the rate of 7.75 percent per year until maturity.[2]

{¶4} With respect to what constitutes a default and the remedies available to the lender upon default, the note provides, in relevant part:

> If this note is secured by real estate of a residence that is personal property, the existence of a default and your remedies for such a default will be determined by applicable law, by the terms of any such separate instrument creating the security interest and, to the extent not prohibited by law and not contrary to the terms of the separate security instrument, by the "Default" and "Remedies" paragraphs herein.

No default or remedy provisions are specified in the mortgage.[3]

---

[1]The Middleburg Heights property was a duplex.  The Formaniks resided in one half of the property and rented out the other half of the property.

[2]The note also specified a "post maturity" interest rate to be paid "on the unpaid balance of [the] note owing after maturity, and until paid in full" of 3 percent above the note rate.  However, it does not appear that Third Federal applied this post-maturity interest rate to Formanik's account.  In its foreclosure complaint, Third Federal sought judgment against Formanik in the amount of $64,983.60 plus interest at the rate of 7.75 percent per annum from July 2, 2010.

[3]The mortgage states that "[a]ll terms, conditions, and covenants" contained in a "master mortgage" on the property recorded on February 18, 2005, are incorporated by reference "as fully and to the same extent as if set forth and

**{¶5}** Under the terms of the note, the borrower is in default if he "fail[s] to make a payment on time or in the amount due." The note provides that upon default, the lender "may demand immediate payment of all [the borrower] owe[s] [the lender] under this note (principal, accrued unpaid interest and other accrued charges)" and "may use any remedy" available to the lender "under state or federal law." The note further provides: "by waiving [its] right to declare an event to be a default, [the lender] does not waive [its] right to later consider the event as a default if it continues or happens again."

**{¶6}** Further, pursuant to the note's "waiver" provision, the borrower agrees:

> **WAIVER**. I give up my rights to require you to do certain things. I will not require you to:
> (1) demand payment of amounts due (presentment);
> (2) obtain official certification of nonpayment (protest); or
> (3) give notice that amounts due have not been paid (notice of dishonor). * * *

The note also states, in relevant part:

> **PAYMENTS:** Each payment I make on this note will first reduce the amount I owe you for charges which are neither interest nor principal. The remainder of each payment will then reduce accrued unpaid interest, and then unpaid principal. If you and I agree to a different application of payments, we will describe our agreement on this note. I may prepay a part of, or the entire balance of this loan without penalty, unless we specify to the contrary on the note. Any partial prepayment will not excuse or reduce any later scheduled payment until this note is paid in full (unless, when I make the prepayment, you and I agree in writing to the contrary). * * *

---

contained herein." However, the "master mortgage" is not part of the record. The mortgage further provides that "[i]f for any reason the Master Mortgage Form shall not be deemed a part of this Security Instrument, then this two (2) page instrument, together with any and all attachments, shall stand by itself as a mortgage given as security to Lender * * * for the payment and performance obligations of each Borrower under the Loan * * * ."

**OBLIGATIONS INDEPENDENT.** \* \* \* You may sue me alone, or anyone else who is obligated on this note, or any number of us together, to collect this note. You may do so without any notice that it has not been paid (notice of dishonor). \* \* \* If you give up any of your rights, with or without notice, it will not affect my duty to pay this note. \* \* \* I agree that you may at your option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting my liability for payment of the note. \* \* \*

**{¶7}** Formanik testified that it was his understanding that he was required to make monthly interest-only payments on the note until its maturity date and then pay off the principal balance when the note matured on September 1, 2008. From September 2007 through August 2008, the Formaniks made monthly interest-only payments on the bridge loan. Vicki Formanik made each payment by bringing the payment into a local Third Federal branch. In addition, in late 2007, after the Formaniks sold a lot they had owned, Formanik paid $48,000 towards the principal balance. As of the September 1, 2008 maturity date, a principal balance of approximately $65,000 remained due on the note.

**{¶8}** Formanik testified that in August 2008, as the maturity date approached, he received two or three letters from Third Federal reminding him that "the principal was coming due" on the bridge loan. The Formaniks had not yet sold their Middleburg

Heights home[4] and lacked the funds to pay off the note. The Formaniks, therefore, failed to pay the $65,000 principal balance due on the maturity date, September 1, 2008.

{¶9} After the maturity date passed, Third Federal continued to send monthly statements to Formanik for interest-only payments on the bridge loan. It made no demand for the payment of the past due principal balance. Formanik testified that in 2009, when the Formaniks refinanced the $221,000 mortgage on their North Royalton home, Third Federal made no mention of the expired maturity date on the bridge loan. The Formaniks continued to make, and Third Federal continued to accept, interest-only payments on the bridge loan without incident until February 2010.

{¶10} In February 2010, when Vicki Formanik went to her local Third Federal branch and attempted to make an interest-only payment on the bridge loan, the bank teller informed her that she could not accept the payment because the account had been frozen. Third Federal also rejected an interest payment tendered by the Formaniks in March 2010.

{¶11} Notwithstanding its rejection of the Formaniks' tendered interest payments, in March 2010, the Formaniks began receiving collection calls from Third Federal and Third Federal also sent several letters to Formanik, demanding payment of the $814.20 "amount due" — i.e., the total of the two months of interest-only payments that Third

---

[4]Formanik testified that the Middleburg Heights property was not listed for sale until June 2009 — nine months after the maturity date of the bridge loan — because a decision had been made to "rehabilitate" the property prior to listing it for sale and he made "extensive repairs" to the property.

Federal had rejected — stating that his loan was "seriously delinquent" and threatening foreclosure if the loan was not made current. Third Federal made no demand for the payment of the outstanding principal balance and did not provide any notice of default on the note.

{¶12} Marlo Blackman, a legal analyst on Third Federal's foreclosure team, testified that Third Federal's monthly billing statements and demand letters are automatically generated by its systems, signed by the appropriate representative and sent out to its customers. Blackman could not explain why the letters and statements generated by Third Federal's automated system for the bridge loan showed only interest as having been due. She testified that there was no agreement between Third Federal and Formanik that Third Federal would not initiate foreclosure proceedings so long as he continued making interest-only payments on the bridge loan.

{¶13} In April 2010, Formanik received a "past due notice" and demand letter listing a "total amount due" of $1,242. He began communicating with Third Federal collections department representative Tim Flynn regarding the bridge loan.[5] Formanik testified that Flynn told him his account had been "frozen" because the loan was not paid off by the maturity date. As a result of the account "freeze" (and the nonpayment of interest resulting from the "freeze"), the account was reported on Formanik's credit report as delinquent. Formanik testified that he requested a short-term extension of the bridge

[5]The Formaniks testified that Vicki Formanik spoke with Flynn regarding the bridge loan in March 2010, but there is no information in the record as to what transpired during those discussions.

loan (originally a 90-day extension, then later, a 12-month extension) from Third Federal. He also requested that Third Federal remove the delinquency reference from his credit report, claiming that it was not accurate. On April 20, 2010, Formanik received a letter from Flynn requesting "workout documentation" to "aid [Third Federal] in developing a workout solution tailored to your specific situation."

**{¶14}** In May 2010, Formanik sent a letter to Third Federal president Mark Stefanski challenging the bank's authority to refuse payments on invoices it had sent and indicating that he thought Third Federal's collection practices were "abusive." On May 17, 2010, Third Federal sent Ronald Formanik a "past due notice" listing a "total amount due" of $1656, representing unpaid interest for February through May 2010. The Formaniks promptly tendered the past due interest and Third Federal accepted the payment. Third Federal also accepted the Formaniks' interest-only payments for June 2010 and July 2010.

**{¶15}** Formanik, a vice-president credit audit functional manager at PNC Bank with 32 years of experience in the banking industry, claimed that the delinquency reported by Third Federal on his credit report rendered him "unbankable." In support of his claim, Formanik introduced printouts of various "alerts" he had received in connection with a credit report monitoring service to which he subscribed, reporting "potentially negative information" that had been posted to his credit report relating to his Third Federal account. These "alerts" indicated that in May 2010 Experian and TransUnion had reported that Formanik's account with Third Federal was "90 past due," with

Experian reporting a "current balance" of $64,983 on the account.[6] Blackman acknowledged that although the delinquency on Formanik's account related to the matured bridge loan, it was a delinquency in the monthly interest payments that Third Federal had initially reported to the credit reporting agencies. Formanik testified that after the negative information appeared on his credit report, he was turned down for overdraft protection on a free checking account (in July 2010), denied a car loan on a vehicle for his daughter (in May 2010), rejected for credit from GE Money Bank (in October 2010) and had to make a security deposit before utilities could be placed in his name after a tenant moved out (in October 2010). Formanik introduced "rejection letters" from each of these creditors in support of his claim.

{¶16} Formanik testified that Flynn had told him verbally that Third Federal's loan committee had denied his request for a loan extension. However, in June 2010, Ronald Formanik received a letter from Deborah Hand, Third Federal's Collections Manager, indicating that Third Federal "did not deny the extension request but sought to

---

[6]No current balance was listed on the alert related to TransUnion. Formanik also introduced printouts of (1) select information that appeared under the "home" or "score" tab on Experian's website, listing his credit score and credit summary as of various dates, (2) an "alert" from January 2011 that Experian had reported the "payment status" on Formanik's Third Federal account as "bank adjustment/deed in lieu of foreclosure/bank liquidation" and (3) a freecreditreport.com summary "as of February 19, 2012" listing information from all three credit reporting agencies regarding the Third Federal account. According to the February 19, 2012 summary, all three credit reporting agencies listed the "Account Status" as "[c]losed"; however, Experian listed "Payment Status" as "[p]aid, was a repossession"; Equifax listed the "Payment Status" as "[p]ays account as agreed" and TransUnion listed the "Payment Status" as "[r]epossession" and $427.00 as "past due." Experian and Equifax also reported the account as having been past due 30, 60 and 90 days in March, April and May 2010, respectively.

offer one of two possible solutions": (1) conversion of the bridge loan into a home equity loan or (2) a deed-in-lieu of foreclosure. As to Formanik's request that Third Federal delete the negative information on his credit report, Third Federal refused, stating that "[a]s the account still contains a maturity date of September 2008, the trade line is reporting accurately."

{¶17} Ronald Formanik declined Third Federal's "solutions." He testified that he was actively marketing the property to sell it and that because Third Federal had begun accepting his payments again and "hadn't stepped up any collection efforts," he did not further inquire if there were any other terms on which Third Federal would grant him a loan extension. Blackman testified that Third Federal never received all of the documents necessary to approve any extension or "work out" at that time.

{¶18} After accepting interest-only payments on the bridge loan for June and July 2010, Third Federal once again refused the Formaniks' tendered interest payments for August and September 2010 because the loan was placed in foreclosure status. In each instance, Third Federal returned the check to Formanik and gave him a "non-monetary receipt" to evidence the fact that he had attempted to make a payment but that it had been refused.

{¶19} After Third Federal refused the August and September 2010 payments, Formanik contacted Blackman and explained to her what had occurred. Formanik claimed that because the bridge loan was reported as a delinquency on his credit report, he could not obtain financing from other lenders to pay off the bridge loan. Formanik

again requested that Third Federal agree to a short-term extension of the bridge loan and remove the delinquency from his credit report so that he could "refinance someplace else" and "pay [the bridge loan] off in full." Blackman spoke with Hand, her manager, about Formanik's request for an extension. Third Federal thereafter offered Formanik a 90-day extension of the bridge loan; however, it would not agree to delete the negative information from his credit report. Ronald Formanik declined Third Federal's offer, indicating that, without the deletion of the negative credit report information, "[a] 90-day extension does nothing for me." He testified that he needed a longer extension of the bridge loan because "it would take time for my credit to heal."[7]

---

[7]Although the Formaniks claim that Third Federal's inaccurate reporting of Formanik's account status made it "impossible" for the Formaniks to refinance the principal obligation under the bridge loan with another lender, they offered no evidence — beyond Formanik's assertions that he was "unbankable" — that they had, in fact, attempted to refinance the bridge loan with another lender and had been denied credit to refinance the loan based on the information reported by Third Federal. When asked whether the delinquencies impacted his ability to refinance, Formanik stated only, "[A]bsolutely. I talked to a mortgage broker that worked with my realtor, explained what was going on and he wouldn't even take an application - - ." At that point, Third Federal's counsel objected to Formanik's testimony, and he offered no further testimony regarding the issue. None of the credit denial letters offered into evidence involved a denial of credit related to an effort to refinance the bridge loan. Unlike the unsecured credit card debt, auto loan and utilities that were the subject of Formanik's denial letters, any refinancing of the bridge loan would have been secured by a mortgage on the Middleburg Heights property. Further, the credit denial letters the Formaniks offered into evidence identified multiple reasons for the creditors' decision to deny credit — a number of which were unrelated to any delinquency reported by Third Federal. Nor do the documents suggest that the Formaniks were unable to obtain any new credit during this period. Indeed, the "alerts" indicate that "CHASE was listed as a new account" on Formanik's credit report as reported by Equifax on June 4, 2010.

{¶20} On October 8, 2010, Third Federal filed a foreclosure action based on Formanik's default on the note secured by the Middleburg Heights property. The Formaniks filed an answer and counterclaim, asserting a laundry list of affirmative defenses and counterclaims for breach of implied contract, breach of the covenant of good faith and fair dealing, violation of R.C. 1345.031(B)(12) and wrongful foreclosure. The Formaniks claimed that an implied contract to extend the maturity date of the bridge loan arose, based on the parties' course of dealing, when Third Federal continued to accept interest-only payments from the Formaniks after the loan's maturity date and that Third Federal breached this agreement in February 2010 when it "arbitrarily began to refuse to accept" the Formaniks' interest payments. The Formaniks further alleged that Third Federal's actions in (1) refusing to accept their interest payments while simultaneously sending letters urging them to make interest payments and (2) failing to remove negative information from Formanik's credit report were not in good faith and caused the Formaniks to go into default, resulting in a wrongful foreclosure. In addition, the Formaniks alleged that Third Federal's offer to convert the bridge loan into a home equity loan constituted unlawful "mortgage flipping" in violation of R.C. 1345.031(B)(12). The Formaniks sought to recover in excess of $25,000 in compensatory damages, punitive damages, attorney fees and costs on their counterclaims. Third Federal filed a reply, acknowledging that automated letters had been generated by its systems and that its agents had discussed with the Formaniks "various options seeking a solution to [Formanik's] failure to pay their contractual obligation * * * as agreed," but

denying the remaining allegations of the Formaniks' counterclaim and asserting that the Formaniks' claims were barred by the statute of frauds.

{¶21} After the foreclosure action was filed, the Formaniks sold the Middleburg Heights property. Although the Formaniks had originally listed the property at $300,000 in June 2009, they sold the property for $160,000 in December 2010. The Formaniks claimed that Third Federal's actions forced them to sell the Middleburg Heights property at a price that was well below its fair market value in order to pay off the bridge loan and avoid foreclosure.

{¶22} The Formaniks used the proceeds of the sale to pay off the bridge loan and Third Federal voluntarily dismissed its foreclosure complaint, leaving only the Formaniks' counterclaims for trial.

{¶23} The Formaniks' counterclaims were tried to a magistrate. On September 28, 2012, the magistrate issued his decision, ruling against the Formaniks on their counterclaims. The magistrate found that (1) Third Federal had no obligation to extend, modify or replace the bridge loan, (2) the course of dealing between the parties did not create an implied contract that extended the term of, or otherwise modified, the note, (3) the terms of the note were controlling, (4) Formanik had waived any requirement that Third Federal demand payment or declare a default on the note and (5) Formanik had defaulted on the note when he failed to pay off the principal balance by the maturity date. The magistrate also found that, considering the totality of the circumstances, including that Third Federal had offered Formanik an extension of the loan and had made other

efforts to find a solution to the Formaniks' inability to pay off the bridge loan, Third Federal had not acted in bad faith in accepting interest-only payments from the Formaniks for a period of time and was "entitled to enforce the original loan documents as written." With respect to the Formaniks' "mortgage flipping" claim, the magistrate concluded that Third Federal had not violated R.C. 1345.031(B)(12) because a new mortgage loan was never executed, and the magistrate found no legal authority to support a claim for wrongful foreclosure under Ohio law.

{¶24} On October 11, 2012, the Formaniks filed an "objection to magistrate's decision/motion for leave to file supplemental objection." Although titled an "objection," the filing did not contain specific objections to any of the magistrate's findings of fact or conclusions of law. Rather, defense counsel requested an extension of the deadline to file objections to the magistrate's decision, asserting that he had not promptly received the magistrate's decision and had "not yet had time to throughly review the decision" with the Formaniks. He further asserted that the Formaniks were awaiting the preparation of the trial transcript that they needed to "frame their objections."

{¶25} In January 2013, the trial transcript was filed with the trial court and the Formaniks' trial counsel filed a motion to withdraw. The trial court granted counsel's motion to withdraw and granted the Formaniks leave until February 27, 2013, to file supplemental objections to the magistrate's decision. The Formaniks did not timely file supplemental objections. On September 24, 2013, the trial court adopted the

magistrate's decision and entered judgment in favor of Third Federal on the Formaniks' counterclaims.

{¶26} On October 24, 2013, the Formaniks appealed the trial court's judgment and filed a motion for relief from judgment under Civ.R. 60(B). In its Civ.R. 60(B) motion, the Formaniks requested that the trial court vacate its September 24, 2013 judgment, allow the Formaniks a reasonable period of time to file their objections to the magistrate's decision and issue a final judgment after considering those objections. This court issued a limited remand for the trial court to consider the Formaniks' Civ.R. 60(B) motion. On remand, the trial court denied the motion. This court then reversed the trial court's denial of the Civ.R. 60(B) motion, vacated the judgment and remanded the matter for consideration of the Formaniks' supplemental objections to the magistrate's decision. *Third Fed. S&L Assn. of Cleveland v. Formanik*, 8th Dist. Cuyahoga Nos. 100562 and 100810, 2014-Ohio-3234 ("*Formanik I*").

{¶27} After the case was remanded, the Formaniks filed supplemental objections, asserting that (1) Third Federal breached an implied contract created by the parties' course of dealing; (2) the note's waiver provisions did not apply because Third Federal's actions "constituted an implied modification of the note"; (3) Third Federal's reporting of "false delinquencies" prevented the Formaniks' performance and, therefore, constituted a breach of the original note; (4) the magistrate erred in concluding that Third Federal's conduct was reasonable and did not constitute bad faith; (5) the magistrate erred in finding that Third Federal did not violate R.C. 1345.031(B)(12); and (6) the magistrate

erred in failing to recognize a claim for "wrongful foreclosure" or "wrongful attempted foreclosure" under Ohio law.

**{¶28}** On September 25, 2015, the trial court overruled the Formaniks' supplemental objections. Following an independent review of the record, the trial court determined that the parties' course of conduct did not give rise to an implied contract. The trial court further found that because Third Federal could have reported the entire principal balance as being delinquent, "which would have had an even larger impact on the Formaniks' attempts to refinance," Third Federal's reported "false delinquencies" relating to the interest-only payments rejected by Third Federal did not prevent the Formaniks from performing under the note. With respect to the Formaniks' bad faith claim, the trial court noted that Third Federal had no obligation to accept interest-only payments after the maturity date, that "a lender's decision to enforce its contract rights is not considered an act of bad faith" and that although Third Federal's conduct in issuing interest only invoices and then refusing to accept interest only payments "isn't an example of best practices," it did not constitute "bad faith." Finally, the trial court agreed with the magistrate's determinations that because no replacement loan was made, Third Federal did not violate R.C. 1345.031(B)(12) and that Ohio law does not recognize an independent cause of action for wrongful foreclosure.

**{¶29}** The Formaniks appealed the trial court's decision and we remanded the case to the trial court for an entry of final judgment. On July 29, 2016, the trial court issued a

final judgment in favor of Third Federal on the Formaniks' counterclaims. The Formaniks have raised the following four assignments of error for review:

Assignment of Error I:
The trial court erred as a matter of law in finding that Third Federal did not breach the original terms of its contract with the Formaniks, and also erred as a matter of law in finding that Third Federal did not breach the terms of the contract as modified by the parties' course of performance, which consisted of Third Federal issuing invoices for interest-only payments, and the Formaniks' payment on those invoices, for nearly two years after the expiration of the original maturity date.

Assignment of Error II:
The trial court erred as a matter of law and fact when it found that Plaintiff-Appellee Third Federal's conduct was reasonable and did not constitute "bad faith."

Assignment of Error III:
The trial court erred as a matter of law in failing to find a violation of Ohio Consumer Sales Practices Act due to evidence of Third Federal's practice of "mortgage flipping."

Assignment of Error IV:
The trial court erred when it declined to recognize a claim for "wrongful foreclosure" or "wrongful attempted foreclosure."

**Law and Analysis**

**Standard of Review**

{¶30} The standard of review on appeal from a decision of a trial court adopting a magistrate's decision is whether the trial court abused its discretion. *Agnew v. Muhammad*, 8th Dist. Cuyahoga No. 100599, 2014-Ohio-3419, ¶ 15, citing *Butcher v. Butcher*, 8th Dist. Cuyahoga No. 95758, 2011-Ohio-2550, ¶ 7. Under an abuse of discretion standard, the trial court's decision will be reversed only if it is unreasonable,

arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "'A decision is unreasonable if there is no sound reasoning process that would support that decision.'" *Ockunzzi v. Smith*, 8th Dist. Cuyahoga No. 102347, 2015-Ohio-2708, ¶ 9, quoting *AAAA Ents. Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). An abuse of discretion may also be found where the trial court "'applies the wrong legal standard, misapplies the correct legal standard, or relies on clearly erroneous findings of fact.'" *Ockunzzi* at ¶ 9, quoting *Thomas v. Cleveland*, 176 Ohio App.3d 401, 2008-Ohio-1720, 892 N.E.2d 454, ¶ 15 (8th Dist.).

**Breach of Contract**

**{¶31}** In their first assignment of error, the Formaniks argue that the parties' course of conduct created a new implied contract that modified the terms of the original note, pursuant to which Third Federal agreed to accept interest-only payments and not collect on the principal balance due until the Formaniks sold the Middleburg Heights property. They further argue that Third Federal breached that implied contract when it refused to accept Formanik's interest-only payments, reported delinquencies on his account to credit reporting agencies and initiated foreclosure proceedings and that the trial court "erred as a matter of law" in concluding otherwise. We disagree.

**{¶32}** As this court stated in *Formanik I*, "[a] contract can be modified when there is clear and convincing evidence of the parties' mutual intent to modify the contract through their course of dealing." *Formanik I*, 2014-Ohio-3234, at ¶ 13, citing *Westgate*

*Ford Truck Sales, Inc. v. Ford Motor Co.*, 2012-Ohio-1942, 971 N.E.2d 967, ¶ 24-25 (8th Dist.); *see also RotoSolutions, Inc. v. Crane Plastics Siding, L.L.C.*, 10th Dist. Franklin Nos. 13AP-1 and 13AP-52, 2013-Ohio-4343, ¶ 19 ("'[A]n oral modification of a written contract can be enforceable notwithstanding a provision in the contract requiring modifications to be in writing where * * * the parties have engaged in a course of conduct in conformance with the oral modification and where the party seeking to enforce the oral modification would suffer injury if the modification were deemed invalid.'"), quoting *Exact Software N. Am., Inc. v. Infocon Sys., Inc.*, N.D.Ohio No. 3:03CV7183, 2004 U.S. Dist. LEXIS 7580 (Apr. 16, 2004); *Miller Lakes Community Servs. Assn. v. Schmitt*, 9th Dist. Wayne No. 15AP0010, 2016-Ohio-339, ¶ 18, 30 ("'Parties may implicitly modify an agreement by their actions. A continued, different, course of performance between parties manifests a modification of the original agreement.'"), quoting *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 115 Ohio St.3d 387, 2007-Ohio-5026, 875 N.E.2d 561, ¶ 39; *Kwikcolor Sand v. Fairmount Minerals, Ltd.*, 8th Dist. Cuyahoga No. 96717, 2011-Ohio-6646, ¶ 20-22 (where it was undisputed that the parties orally agreed to modify contract's pricing schedule and operated under the modified pricing schedule for more than a year, plaintiff waived the contract's no-oral modification provision and the parties were contractually bound to the modified pricing structure). Even contracts that are required by the statute of frauds to be in writing can be modified orally "when the parties to the written agreement act upon the terms of the oral agreement." *Formanik I* at ¶ 13, citing *200 W. Apts. v. Foreman*, 8th Dist. Cuyahoga No. 66107, 1994 Ohio App.

LEXIS 4081 (Sept. 15, 1994); *see also 3637 Green Rd. Co. v. Specialized Component Sales Co.*, 8th Dist. Cuyahoga No. 103599, 2016-Ohio-5324, ¶ 21-25, 30-35 (substantial, competent credible evidence supported the trial court's conclusion that commercial landlord waived lease's no-oral-modification and written waiver provisions by its subsequent course of conduct, resulting in an enforceable oral agreement to reduce the rent due under the lease, where the landlord's records showed that landlord "invoiced" monthly rent at reduced rate and tenant "paid" monthly rent at reduced rate leaving a zero balance due on the account).[8]

{¶33} The Formaniks contend that Third Federal's actions in (1) invoicing and accepting interest-only payments for 17 months after the note's maturity date; (2) again invoicing and accepting interest-only payments in June and July 2010 after initially refusing Formanik's interest-only payments in February and March 2010; (3) reporting delinquencies of Formanik's interest-only payments to the credit reporting agencies; and (4) in failing to mention the delinquency on the principal of the bridge loan when it refinanced the Formaniks' mortgage on their North Royalton home in 2009 was evidence of its intent to modify the terms of the note. In support of their argument, the Formaniks rely on this court's decision in *Automated Solutions Corp. v. Paragon Data Sys.*, 167 Ohio App.3d 685, 2006-Ohio-3492, 856 N.E.2d 1008 (8th Dist.). In that case, a hardware contractor and software contractor contracted to work on a project for the

---

[8]In *Formanik I*, this court held that Third Federal had waived its statute of frauds defense by failing to raise it at trial. *Formanik I*, 2014-Ohio-3234, at ¶ 13.

Chicago Tribune (the "Tribune") to provide the Tribune with hand-held computerized inventory devices (the "building contract"). *Id.* at ¶ 2. Under the terms of the building contract, the software contractor had 180 days to complete the development of certain software. However, the Tribune had express authority to alter the project's time lines. *Id.* at ¶ 23-25. Development of the software took longer than expected because the Tribune requested numerous changes to the software, resulting in delays and continuances. *Id.* at ¶ 23. The parties executed a letter agreement amending certain provisions of the building contract, including establishing new deadlines for the software contractor's performance. *Id.* at ¶ 5-6.

{¶34} In the litigation that followed, the hardware contractor claimed that the software contractor had breached their contract when it missed the original 180-day deadline set forth in the building contract. *Id.* at ¶ 21-22. In affirming the trial court's judgment in favor of the software contractor, this court held that the hardware contractor had presented no evidence to support its assertion that the software contractor had failed to meet the contract deadlines as modified by the Tribune, that "by failing to complain of or exercise its rights under the contract at the time the deadlines were allegedly breached," the hardware contractor "waived its rights to enforce those deadlines" and that the letter agreement was "a clear and unequivocal acceptance that the 180-day deadline [had] passed and that the parties changed the terms of the agreement." *Id.* at ¶ 27.

{¶35} *Automated Solutions* does not warrant reversal of the trial court's decision in this case. First, in *Automated Solutions,* this court rejected the appellant's challenges to

the trial court's factual findings based on the evidence that was presented in that case. Here, the Formaniks ask us to overturn the trial court's factual findings based on the evidence presented. Second, in *Automated Solutions*, there was a letter of agreement signed by the parties in which they expressly agreed to modify the terms of their original agreement. The Formaniks have not claimed that they ever had any discussions with Third Federal, prior to April 2010, about extending the maturity date of the loan and have not identified any other type of "clear, unequivocal, decisive act" by Third Federal that would mandate a finding that — so long as the Formaniks continued to make timely interest-only payments — Third Federal waived its right to enforce Formanik's obligation to pay the principal balance, was estopped from enforcing Formanik's obligation to pay the principal balance, or otherwise did not intend that Formanik would pay off the principal balance until they sold the Middleburg Heights property. Further, unlike in *Automated Solutions*, in which there was no provision in the contract at issue that any waiver of a breach of the agreement shall not be deemed a waiver of any subsequent breach, *id.* at ¶ 30, in this case the note expressly provided that "[b]y waiving [its] right to declare an event to be a default, [Third Federal] does not waive [its] right to later consider the event as a default if it continues or happens again" and that Third Federal "may at [its] option extend this note or the debt represented by this note, or any portion of the note or debt, from time to time without limit or notice and for any term without affecting [Formanik's] liability for payment of the note."

{¶36} Whether a written contract has been modified by a course of dealing is a question of fact for the trier of fact. *Westgate Ford Truck Sales,* 2012-Ohio-1942, 971 N.E.2d 967, at ¶ 2. In this case, after considering all the evidence, the trial court found that that the conduct of the parties did not rise to the level of creating an enforceable implied contract and that there was otherwise no agreement, implied or otherwise, between the parties to extend the maturity date of the bridge loan and adopted the magistrate's decision reaching the same conclusion. Following a thorough review of the record, we cannot say that the trial court abused its discretion in doing so.

{¶37} Although there is evidence of facts in the record from which it might be inferred that the parties had an implied agreement to extend the maturity date of the bridge loan (for at least some period of time) — for example, Third Federal's actions in sending out invoices for interest-only payments and delinquency notices for interest-only payments after the maturity date had passed, its acceptance of interest-only payments for more than a year after the maturity date had passed, its reporting of account delinquencies as interest-only delinquencies (as opposed to reporting the principal balance due as delinquent) and the stated purpose of the bridge loan, i.e., "to fund the purchase of a new residence"[9] — that is not the only conclusion that could be reasonably drawn from the evidence presented.

---

[9]The Formaniks argue that because the loan was a "bridge loan," the parties "intended" that it would be "paid off from the sale proceeds of the first home." The Formaniks further argue that "when the property did not sell as quickly as was hoped, the maturity date was extended by the unequivocal acts of both parties to the contract." However, as noted above, the Formaniks did not list the Middleburg Heights property for sale until June 2009 — nine months after the maturity date of

**{¶38}** Even if the parties' actions in invoicing, submitting and accepting interest-only payments had constituted a course of performance that impliedly extended the maturity date of the bridge loan until February 2010 when Third Federal "froze" the account or August 2010 (after Third Federal invoiced and accepted its last interest payment), there is no evidence in the record to support the Formaniks' claim that Third Federal had agreed to extend the bridge loan — so long as the Formaniks continued to make timely interest payments — until the Formaniks sold the Middleburg Heights property. Rather, the parties' actions support the conclusion that there was no such agreement. Formanik testified that, beginning in April 2010, he made several requests for an extension of the bridge loan from Third Federal. Third Federal, in turn, offered him several options for refinancing the bridge loan, including a 90-day extension, which he declined. Formanik also claimed to have made several unsuccessful attempts to refinance the bridge loan elsewhere.

**{¶39}** The trial court's decision is supported by competent, credible evidence. Based on the record before us, we cannot say that the trial court abused its discretion in adopting the magistrate's decision in this case.

**{¶40}** The Formaniks further argue that even if the parties' course of performance did not modify the terms of the note, the trial court still erred in ruling against them on their breach of contract claim because Third Federal's practice of refusing their

---

the bridge loan. It is unclear from the record whether Third Federal knew that the Formaniks had not listed the Middleburg Heights property for sale before the maturity date on the bridge loan had passed.

interest-only payments and then reporting delinquencies in the interest-only payments to credit reporting agencies "sabotag[ed]" their ability to perform under the note and thereby prevented their performance, constituting a breach of the contract between the parties. Once again, we disagree.

{¶41} A party to a contract who prevents performance on the part of an adverse party cannot rely on that nonperformance to claim a breach. *See, e.g., Fabrication Group L.L.C. v. Willowick Partners L.L.C.*, 11th Dist. Lake No. 2011-L-141, 2012-Ohio-4460, ¶ 45, citing *Suter v. Farmers Fertilizer Co.*, 100 Ohio St. 403, 126 N.E. 304 (1919); *see also FDIC v. Traversari*, 11th Dist. Geauga No. 2008-G-2859, 2010-Ohio-2406, ¶ 22 ("'It is an implied condition of every contract that one party will not prevent or impede performance by the other. If he does prevent or impede performance, whether by his prior breach or other conduct, he may not then insist on performance by the affected party, and he cannot maintain an action for nonperformance if the promises are interdependent.'"), quoting *Fed. Natl. Mtge. Assn. v. Banks*, 2d Dist. Montgomery No. 11667, 1990 Ohio App. LEXIS 638, *8-9 (Feb. 20, 1990); *Ambrosia Coal & Constr. Co. v. C.B.G.*, 7th Dist. Mahoning No. 94 C.A. 199, 1996 Ohio App. LEXIS 1888, *6-7 ("A party who prevents performance or his own part or on the part of the adverse party, cannot take advantage of such noncompliance or non-performance by the party obligated to perform under the contract."). This, however, is not that case.

**{¶42}** Although Blackman acknowledged that Third Federal did not properly report the delinquency on Formanik's account to the credit reporting agencies,[10] i.e., that Third Federal reported the delinquency as a failure to timely make installment monthly payments from February-May 2010, rather than a failure to timely pay a principal balance due of approximately $65,000 from September 1, 2008, these reporting errors (and any subsequent failure by Third Federal to remove the "false delinquencies" from his credit reports) did not have prevented Formanik's performance under the note. The "performance" at issue here was Formanik's obligation to timely pay the principal balance that was due on September 1, 2008. Any reporting errors by Third Federal in the spring of 2010 could not have prevented Formanik's performance a year-and-a-half earlier in September 2008. Accordingly, Third Federal's reporting of "false delinquencies" could not have prevented Formanik's performance under the note and, therefore, could not have constituted a breach of the note.

**{¶43}** The Formaniks' first assignment of error is overruled.

**Implied Duty of Good Faith and Fair Dealing**

**{¶44}** In their second assignment of error the Formaniks argue that the trial court committed reversible error when it concluded that Third Federal's conduct was

---

[10]Formanik did not introduce his full credit reports from the time period at issue into evidence at trial. Rather, he introduced copies of "alerts" and other select information from or relating to his credit reports. *See* discussion *supra*. Accordingly, it is not entirely clear from the record what information Third Federal reported to each of the three credit reporting agencies, what each of those credit agencies, in turn, reported regarding Formanik's account and how, if at all, that impacted his creditworthiness.

"reasonable" and did not constitute "bad faith." The Formaniks contend that in erroneously reporting delinquencies concerning the interest-only payments the Formaniks tendered to it and refusing to correct those erroneously reported delinquencies, Third Federal "created a significant obstacle to the Formaniks' performance," thereby breaching its implied duty of good faith and fair dealing.

{¶45} A duty of good faith and fair dealing is implied in every contract. *See, e.g., Kirkwood v. FSD Dev. Corp.*, 8th Dist. Cuyahoga No. 95280, 2011-Ohio-1098, ¶ 9. "'Good faith' is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of drafting, and which therefore was not resolved explicitly by the parties.'" *Ed Schory & Sons v. Francis*, 75 Ohio St.3d 433, 443-444, 662 N.E.2d 1074 (1998), quoting *Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting*, 908 F.2d 1351, 1357-1358 (7th Cir.1990). It does not, however, "supplant" the express terms of the contract. *Gator Dev. Corp. v. VHH, Ltd.*, 1st Dist. Hamilton No. C-080193, 2009-Ohio-1802, ¶ 24.

> "'Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party.' * * * [B]ad faith may consist of inaction, or may be the 'abuse of a power to specify terms, [or] interference with or failure to cooperate in the other party's performance.'" *Littlejohn v. Parrish*, 163 Ohio App.3d 456, 2005-Ohio-4850, 839 N.E.2d 49, ¶ 26, quoting Restatement of the Law 2d, Contracts, Section 205, Comments a and d (1981). Whether parties have acted in good faith and have "deal[t]" fairly and "reasonably with each other"

or have breached that obligation and acted in bad faith is a question of fact. *Littlejohn* at ¶ 28.

{¶46} The covenant of good faith and fair dealing is part of a contract claim. A breach of the covenant of good faith and fair dealing "does not stand alone as a separate claim from breach of contract." *Stancik v. Deutsche Natl. Bank*, 8th Dist. Cuyahoga No. 102019, 2015-Ohio-2517, ¶ 46 ("Outside of the insurance context * * * the breach of this duty does not exist as a separate cause of action from a breach of contract claim."); *see also Pappas v. Ippolito*, 177 Ohio App.3d 625, 2008-Ohio-3976, 895 N.E.2d 610, ¶ 57 (8th Dist.) ("'Parties to a contract are bound toward one another by standards of good faith and fair dealing. However, this does not stand for the proposition that breach of good faith exists as a separate claim. Instead, good faith is part of a contract claim and does not stand alone.'"), quoting *Dawson v. Blockbuster, Inc.*, 8th Dist. Cuyahoga No. 86451, 2006-Ohio-1240, ¶ 35; *Gianetti v. Teakwood, Ltd.*, 10th Dist. Franklin No. 15AP-413, 2016-Ohio-213, ¶ 35 ("'[A] claim for breach of contract subsumes the accompanying claim for breach of the duty of good faith and fair dealing.'"), quoting *Krukrubo v. Fifth Third Bank*, 10th Dist. Franklin No. 07AP-270, 2007-Ohio-7007, ¶ 19.

{¶47} On these facts, for the same reasons the Formaniks failed to establish that Third Federal breached its contract with Formanik by allegedly precluding his performance under the note, they also failed to establish a breach of the duty of good faith and fair dealing. *See, e.g., Ed Schory & Sons*, 75 Ohio St.3d at 443-444, 662 N.E.2d 1074 (bank's decision to enforce parties' agreements as written and not lend additional funds to developer could not be considered an act of bad faith; "'[a]lthough courts often refer to the obligation of good faith that exists in every contractual relation, * * * this is

not an invitation to the court to decide whether one party ought to have exercised privileges expressly reserved in the document'"), quoting *Kham & Nate's Shoes*, 908 F.2d at 1357.

{¶48} Accordingly, the Formaniks' second assignment of error is overruled.[11]

**Claim under Ohio Consumer Sales Practices Act for "Mortgage Flipping"**

{¶49} In their third assignment of error, the Formaniks contend that the trial court erred in failing to find a violation of the Ohio Consumer Sales Practices Act due to evidence of attempted "mortgage flipping" by Third Federal when it offered to refinance the bridge loan after the maturity date expired.

{¶50} R.C. 1345.031(A) prohibits "suppliers" from committing an "unconscionable act or practice concerning a consumer transaction in connection with a residential mortgage." Under R.C. 1345.031(B)(12), such "unconscionable" acts or practices include:

> Knowingly or intentionally engaging in the act or practice of "flipping" a mortgage loan. "Flipping" a mortgage loan is *making a mortgage loan* that refinances an existing mortgage loan when the *new loan* does not have reasonable, tangible net benefit to the consumer considering all of the

---

[11]We by no means condone Third Federal's conduct in this case. Although the trial court acknowledged that Third Federal's conduct in invoicing Formanik for interest-only payments, refusing to accept those interest-only payments, and then reporting his account as delinquent due to the "nonpayment" of payments it refused "isn't an example of best practices," it is much more than that. The fact that Third Federal could have properly reported the entire principal balance as past due does not excuse its conduct in preventing the Formaniks from making interest-only payments and then reporting those payments as delinquent. However, based on the record here, we cannot state that the trial court abused its discretion in concluding that such conduct did not provide grounds for relief on the particular claims asserted by the Formaniks.

circumstances, including the terms of both the new and refinanced loans, the cost of the new loan, and the consumer's circumstances. This provision applies regardless of whether the interest rate, points, fees, and charges paid or payable by the consumer in connection with the refinancing exceed any thresholds specified in any section of the Revised Code.

(Emphasis added.)

**{¶51}** The trial court found that Third Federal did not violate R.C. 1345.031(B)(12) because a new mortgage loan was never made. We agree. R.C. 1345.031(B)(12) requires that a "new" replacement mortgage loan be "made" before a violation can occur. Accordingly, the Formaniks' third assignment of error lacks merit and is overruled.

**Claim for "Wrongful Foreclosure"**

**{¶52}** In their fourth and final assignment of error, the Formaniks claim that the trial court erred in concluding that there is no distinct claim for "wrongful foreclosure" or "wrongful attempted foreclosure" under Ohio law. Once again, we disagree.

**{¶53}** Although the Formaniks contend that "Ohio courts appear to recognize claims for 'wrongful foreclosure'" because "numerous claims for 'wrongful foreclosure' have been brought by litigants," they have not cited a single Ohio case in which a plaintiff has prevailed on a claim of wrongful foreclosure or that identifies what the elements of such a claim might be. Simply because a claim is referenced in a case as having been brought by a litigant does not mean that that claim has been recognized under Ohio law. *See Ogle v. BAC Home Loans Servicing LP*, 924 F.Supp.2d 902, 914 (S.D.Ohio 2013) ("'Wrongful foreclosure' in Ohio 'describes not a discrete claim with specific elements

but a collection of challenges to a foreclosure action.'"), quoting *Hammond v. Citibank*, *N.A.*, S.D. Ohio No. 2:10-CV-1071, 2011 U.S. Dist. LEXIS 109818, *40-41 (Sept. 27, 2011); *Wells Fargo Bank, N.A. v. Favino*, N.D. Ohio No. 1:10 CV 571, 2011 U.S. Dist. LEXIS 35618, *35-36 (Mar. 31, 2011) (granting defendant's motion to dismiss wrongful foreclosure claim because "it cannot be a cause of action, only an affirmative defense"); *but see* 69 Ohio Jur.3d Mortgages § 328 ("In general, an action at law by the mortgagor against the mortgagee may be maintained to recover damages for a wrongful foreclosure — that is, a foreclosure without right, which would ordinarily be invalid irrespective of the manner in which it is executed. The action does not lie where at least a prima facie breach of a condition in the mortgage agreement by the mortgagor has been alleged."); *First Fed. S. & L. Assn. v. Perry's Landing, Inc.*, 11 Ohio App.3d 135, 147, 463 N.E.2d 636 (6th Dist.) (where mortgagor executed a land installment contract for conveyance of mortgaged property, which triggered a due-on-sale clause, mortgagor's claim that mortgagee should be equitably estopped from enforcing its rights under the due-on-sale clause and foreclosing on the mortgaged property did not given rise to a claim for damages for wrongful foreclosure by the mortgagor against the mortgagee; although equitable estoppel issues would be resolved by the trier of fact, the court held that "damages for wrongful foreclosure cannot logically be sought by raising the defense of equitable estoppel whether the same is successfully invoked or not").[12] Furthermore, in

---

[12]In *Corbett v. Beneficial Ohio, Inc.*, S.D. Ohio No. 3:11-cv-339, 2013 U.S. Dist. LEXIS 15053, *8 (Feb. 1, 2013), the United States District Court for the Southern District of Ohio observed that "[s]everal other states recognize freestanding claims of wrongful foreclosure and, despite the

this case, given that Third Federal did not foreclose on the Middleburg Heights property, any such claim the Formaniks might have would necessarily be limited to a claim for attempted "wrongful foreclosure."

{¶54} We need not decide this issue because even assuming Ohio recognized an independent cause of action for attempted wrongful foreclosure, we would find no error by the trial court in ruling against the Formaniks on that claim because the Formaniks did not establish that Third Federal's attempted foreclosure of the Middleburg Heights property was "wrongful." The same allegations that formed the basis for the Formaniks' breach of contract claim — i.e., the parties' course of performance in invoicing, submitting and accepting interest-only payments after the maturity date and Third Federal's alleged prevention of performance in later rejecting interest-only payments and reporting deficiencies in interest-only payments to the credit reporting agencies — formed the basis for its "wrongful foreclosure" claim. The Formaniks have not alleged that there was some defect, fraud or irregularity in the foreclosure process (or attempted foreclosure process) or in the events leading up to the foreclosure proceeding that entitled them to relief separate and apart from their contract claim against Third Federal. There was no

statement in *Hammond*, Ohio's stance on this issue appears to be somewhat unsettled." It certified two questions to the Ohio Supreme Court: (1) "Does Ohio recognize a freestanding cause of action for 'wrongful attempted foreclosure?'" and (2) "If so, what are the elements of such a claim, and what damages are available." *Id.* at *9. The court originally agreed to address these questions. *Corbett v. Beneficial Ohio, Inc.*, 135 Ohio St.3d 1310, 2013-Ohio-1622, 986 N.E.2d 28. However, after the parties filed a joint motion to withdraw the certified questions, the court granted the motion and dismissed the case. *Corbett v. Beneficial Ohio, Inc.*, 136 Ohio St.3d 1436, 2013-Ohio-2685, 989 N.E.2d 1048.

dispute that Formanik failed to pay off the principal balance when due, constituting an event of default under the express terms of the note, and that the note was secured by a mortgage on the Middleburg Heights property. As detailed above, the record supports the trial court's conclusions that Third Federal did not breach the note, that the parties did not, by their course of performance, enter into an implied contract to extend the maturity date and that Third Federal was entitled to enforce Formanik's obligations under the note.

Accordingly, the Formaniks' fourth assignment of error is overruled.

**{¶55}** Judgment affirmed.

It is ordered that appellants pay appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Court of Common Pleas to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, PRESIDING JUDGE

MELODY J. STEWART, J., and
ANITA LASTER MAYS, J., CONCUR